

NUMBER 13-17-00101-CV

# COURT OF APPEALS

# THIRTEENTH DISTRICT OF TEXAS

# CORPUS CHRISTI – EDINBURG

RUSTY MORALES AND
OLGA MARIE ORTIZ,                                                    Appellants,

v.

ALCOA WORLD ALUMINA L.L.C.
AND STEPHEN ALVARADO,                                               Appellees.

On appeal from the 135th District Court
of Calhoun County, Texas.

# MEMORANDUM OPINION

**Before Chief Justice Valdez and Justices Contreras and Hinojosa
Memorandum Opinion by Justice Contreras**

Appellants Rusty Morales and Olga Marie Ortiz sued appellees Alcoa World
Alumina L.L.C. (AWA or Alcoa) and Stephen Alvarado, an AWA employee, after Morales
suffered personal injuries in an industrial accident.  The trial court granted summary

judgment motions filed by AWA and Alvarado and dismissed the suit.

On appeal, Morales and Ortiz raise two issues concerning the statutory defense available to property owners in suits brought by contractors under chapter 95 of the civil practice and remedies code. *See* TEX. CIV. PRAC. & REM. CODE ANN. § 95.003 (West, Westlaw through 2017 1st C.S.). They argue that: (1) as a matter of law, the chapter 95 defense does not apply to their claims; and (2) even if it does apply, there are fact issues precluding summary judgment in favor of AWA. Morales and Ortiz also contend that the trial court erred in granting summary judgment to Alvarado because he is individually liable for his own negligence.

We conclude that chapter 95 is applicable to the claims raised against AWA, but that summary judgment was improper as to both AWA and Alvarado because issues of material fact exist. We affirm in part and reverse and remand in part.

## I. BACKGROUND

Morales was an employed as a supervisor at Turner Industries Group, LLC (Turner), which was under contract to provide maintenance and repair services at AWA's alumina refining facility in Point Comfort, Texas. At the facility, raw bauxite dirt is refined through the "Bayer process" to produce pure aluminum oxide, or alumina. One of the steps of this process involves creating a solution of bauxite and sodium hydroxide called "process liquor," then pumping that solution through pipes, or "risers," to presses which filter the solution. Over time, the flow of process liquor in the risers causes solid residue to build up, and the risers must be periodically washed out with a cleaning solution known as "caustic." At the Point Comfort plant, AWA uses a system of solid and open "blinds"—circular pieces of steel inserted between flanges—to control the flow of caustic and

2

process liquor in the various risers.

On September 3, 2014, Morales was supervising a crew of Turner employees who were instructed by AWA to "swap out" blinds on two of the risers at the plant. At the time, riser number 27 was being washed with caustic while riser number 25 contained liquor. AWA hired Turner to, among other things, replace the solid blind on a pipe leading to riser 25 with an open blind that would allow caustic to flow into that riser. When two Turner employees unbolted a flange and removed the solid blind, they found that a hardened "pancake" of scale had formed behind the blind, completely obstructing the pipe. They used a jackhammer to remove the scale deposit. When the jackhammer broke through the scale, hot liquor sprayed out of the pipe and onto Morales, causing him to suffer severe burns on his back and his right arm.

Morales and his wife Ortiz (collectively, Morales) sued AWA and Alvarado, contending among other things that they were negligent by failing to ensure that all of the liquor was cleared out of riser 25 before giving the Turner crew orders to begin their work. Morales further alleged that AWA had actual knowledge that the riser "was not isolated from the flow" of liquor.

AWA, Alvarado, and Morales each filed summary judgment motions. In its motion, AWA asserted that it was entitled to judgment as a matter of law under chapter 95 of the civil practice and remedies code, which provides:

> A property owner is not liable for personal injury, death, or property damage to a contractor, subcontractor, or an employee of a contractor or subcontractor who constructs, repairs, renovates, or modifies an improvement to real property, including personal injury, death, or property damage arising from the failure to provide a safe workplace unless:
>
> (1)     the property owner exercises or retains some control over the manner in which the work is performed, other than the right to order the work to start or stop or to inspect progress or receive reports; and

3

> (2) the property owner had actual knowledge of the danger or condition resulting in the personal injury, death, or property damage and failed to adequately warn.

TEX. CIV. PRAC. & REM. CODE ANN. § 95.003 (West, Westlaw through 2017 1st C.S.). AWA contended that there was no evidence that it controlled Turner's work or that it actually knew about the presence of hot liquor in riser number 25 at the time Morales was injured. In response, Morales argued that chapter 95 does not apply and, in the alternative, that there are fact questions as to the section 95.003 factors. *See id.* Morales also moved for partial summary judgment on grounds that chapter 95 does not apply. Alvarado's motion for summary judgment contended that there was no evidence that Alvarado owed or breached any duty to Morales apart from AWA's duty.

After a hearing, the trial court granted AWA's and Alvarado's motions, denied Morales's motion, and rendered judgment that Morales take nothing by way of his suit. This appeal followed.

## II. DISCUSSION

### A. Standard of Review and Applicable Law

We review summary judgments de novo. *Neely v. Wilson*, 418 S.W.3d 52, 59 (Tex. 2013). AWA's motion raised traditional and no-evidence grounds; Alvarado's motion raised no-evidence grounds only; and Morales's motion raised traditional grounds only. Though the burden varies for traditional and no-evidence summary judgment motions, all parties brought forth summary judgment evidence; therefore, the differing burdens are immaterial and the ultimate issue is whether a fact issue exists. *Id.* (citing *Buck v. Palmer*, 381 S.W.3d 525, 527 & n.2 (Tex. 2012)); *see* TEX. R. CIV. P. 166a(c), (i). A fact issue exists, precluding summary judgment, if there is more than a scintilla of probative evidence to support the plaintiff's claim. *Id.* Evidence is more than a scintilla if

4

it "rises to a level that would enable reasonable and fair-minded people to differ in their conclusions." *Serv. Corp. Int'l v. Guerra*, 348 S.W.3d 221, 228 (Tex. 2011). Evidence is less than a scintilla if it is "so weak as to do no more than create a mere surmise or suspicion that the fact exists." *Regal Fin. Co. v. Tex Star Motors, Inc.*, 355 S.W.3d 595, 603 (Tex. 2010). We review the summary judgment evidence in the light most favorable to the non-movant, indulging every reasonable inference and resolving any doubts against the motion. *City of Keller v. Wilson*, 168 S.W.3d 802, 824 (Tex. 2005).

When both sides move for summary judgment and the trial court grants one motion and denies the other, we review the summary judgment evidence presented by both sides, determine all questions presented, and render the judgment the trial court should have rendered. *SeaBright Ins. Co. v. Lopez*, 465 S.W.3d 637, 641–42 (Tex. 2015).

As noted, chapter 95 of the Texas Civil Practice and Remedies Code provides that AWA is not liable for the personal injury of any independent contractor's employee who constructs, repairs, renovates, or modifies an improvement to real property unless AWA: (1) exercised or retained some control over the manner in which the work was performed, other than the right to order the work to start or stop or to inspect progress or receive reports; and (2) had actual knowledge of the danger or condition resulting in the personal injury and failed to adequately warn. TEX. CIV. PRAC. & REM. CODE ANN. § 95.003. Chapter 95 is applicable only to a claim:

> (1) against a property owner, contractor, or subcontractor for personal injury, death, or property damage to an owner, a contractor, or a subcontractor or an employee of a contractor or subcontractor; and
>
> (2) that arises from the condition or use of an improvement to real property where the contractor or subcontractor constructs, repairs, renovates, or modifies the improvement.

5

*Id.* § 95.002 (West, Westlaw through 2017 1st C.S.). Chapter 95 applies "to all negligence claims that arise from either a premises defect or the negligent activity of a property owner or its employees." *Abutahoun v. Dow Chem. Co.*, 463 S.W.3d 42, 50 (Tex. 2015).

The property owner has the burden to establish that chapter 95 applies to the plaintiff's claim. *See Gorman v. Ngo H. Meng*, 335 S.W.3d 797, 802 (Tex. App.—Dallas 2011, no pet.); *Rueda v. Paschal*, 178 S.W.3d 107, 111 (Tex. App.—Houston [1st Dist.] 2005, no pet.). Once the defendant has shown that chapter 95 applies to the claim, the plaintiff has the burden to establish both prongs of section 95.003. *Gorman*, 335 S.W.3d at 802–03; *Rueda*, 178 S.W.3d at 111.

**B.    Summary Judgment Evidence**

In support of its summary judgment motion, AWA produced evidence including a copy of the contract between AWA and Turner which was in effect at the time of the accident. The contract provides that Turner is an independent contractor and that AWA "disclaims any right to control the manner of performance by [Turner] and [AWA] will not control the manner of performance by [Turner]."

AWA also produced a transcript of Morales's deposition, in which he testified that he was supervising two Turner employees, Leo Gayton and Dominick Cano, at the time of the accident. Morales stated that he was responsible for ensuring that Turner's safety rules were followed as they applied to Gayton and Cano. Morales acknowledged that he signed a "Tagout/Lockout Verification" form showing that he visually inspected the line to ensure that it was clear. He also signed a "Job Safety Analysis" worksheet indicating that "Line of Fire" was one of the "potential risks" involved in the job.

6

While Gayton and Cano were removing bolts from flanges to access the pipe leading to riser 25, Morales went to Turner's trailer to get water for Gayton and Cano, and he then came back to the work site to see that the crew was using a jackhammer on the scale deposit. Shortly thereafter, process liquor sprayed out and hit Morales from behind, causing him to fall forward. He then ran to a safety shower. His burns were extensive enough that he had to be airlifted to San Antonio for skin graft surgery to be performed.

Morales testified that he had been fully informed as to the hazards involved in working with materials such as Bayer process liquor, and, according to his training, a full Tyvek chemical suit with face protection is required to be worn when working on a live line or a line that cannot be isolated. Gayton and Cano were wearing face shields and chemical protective suits at the time of the accident. Morales was not wearing such protection, however, because he was only supervising, not doing the job himself. Morales did not set up a barricade around the work area because the area was congested and tight, and he did not think a barricade was necessary.

When Morales was asked whether anyone from AWA told Gayton and Cano "how to jackhammer out that scale," Morales stated: "I'm not sure. Alvarado was there the whole time. He could have. . . . He pointed some things out to them." Morales later clarified that he did not witness Alvarado give Gayton or Cano any instructions as to how to open the line or use the jackhammer, and he did not know of any evidence that AWA personnel knew that riser 25 contained process liquor at the time Gayton or Cano were working on it.

AWA's maintenance supervisor Jeffrey McCaskill stated in deposition testimony that he walked through the job with Morales at around 9:00 a.m. and hung the work permit

7

at around 10:30 a.m.  Initially, McCaskill informed Morales that the risers were not ready to be worked on because he had not yet verified that they had been fully drained.  He stated that he and Alvarado opened the drain connected to risers 25 and 27 in order to drain them of any remaining liquor.  When AWA employee Rudy Pena attempted to hook up a hose to the drain, liquor sprayed out onto Pena's face.  Pena immediately went to the safety shower to rinse but did not suffer any burns.  McCaskill attributed this incident to a "bad gasket" and stated that it did not indicate that there was a problem with the valve that would allow process liquor into the riser.  After returning from taking Pena to get medical care as a precaution, McCaskill saw that the "the drain line to number 25 press riser was coming out full force," indicating that the valve was not properly seated, which McCaskill also said was normal.  The valve was then replaced.

McCaskill conceded that he did not ensure that the line was flushed with water, but he stated that this was not required by AWA procedures because "open[ing] the drain" and observing the flow stop is "a form of verification on our lockout/tagout procedure."  He opined that the accident involving Morales occurred because the valve was leaking and because Morales was in the "line of fire" without wearing protective equipment.  McCaskill stated that Turner has safety and protective equipment requirements in addition to those set by AWA, and that "most of" the requirements were "for them to decide."  He speculated that the valve leak was caused by scale breaking off and plugging the valve after he had verified it was clear, though he had not seen or heard of this type of incident happening before.

McCaskill stated that each of the dozens of risers at the facility are scheduled to be washed out with caustic once annually.  He agreed with Morales's counsel that Turner

8

employees are required to follow specific directions for their assigned tasks, including the flange break that was done here. When asked whether Turner employees are "free to ignore the Alcoa way to do things and do it their own way," McCaskill replied "No."

The summary judgment evidence produced by Morales included a twelve-page "Standard Work Instruction" (SWI) form containing detailed guidelines on how AWA's contractors must perform flange breaks at the Point Comfort plant. The SWI form contains a numbered list of safety items including: "Wear standard Personal Protective Equipment (PPE): Hardhat, safety-toed foot wear, goggles, appropriate gloves, hearing protection, long sleeve shirt and DAP on self. Additional PPE if verification cannot be performed is chemical suit, chemical gloves, rubber boots and face shield."[1] The form also contains a numbered list describing the procedure to be used for unbolting flanges, including the exact order in which particular bolts are supposed to be removed. The list includes the following items:

3.      VERIFY system has been flushed with water by witnessing flushing & draining of system. If verification cannot be performed, additional PPE with standard PPE must be worn. If verification as defined in this document cannot be performed a Flange Break Permit must be completed and authorized by the Department Superintendent or his/her designee prior to beginning work.

. . . .

15.      TRY not to destroy gasket when breaking seal to ensure that if line is pressured-up, the flange can be tighten [sic] back up. If the line releases an excess amount of liquids the person(s) shall step back

---

[1] The SWI form defines "verification" as:

The witnessing of water being flushed through piping, vessels, tanks, pump or valves before the unbolting of flanges. This verification must be performed before starting task. Person(s) performing the task of flange break must personally observe the flushing of water across the flange being unbolted. The flushing of water may be performed by person performing flange break task or another classification.

9

to avoid being contacted with hot or chemical liquids. DO NOT PUT YOUSELF [sic] IN LINE OF FIRE.

16. MAINTAIN a defensive posture during flange break in case of displacement of the pipe and possible spray of liquids breaking loose flanges.

    . . . .

18. REMOVE any scale, debris or old gasket material between flanges before make-up of flanges to prevent leaks to system when placing back in service.

In a section entitled "Verification for Flange Break," the SWI states:

FLUSHING of water must be performed from isolation to isolation for true verification not just across the flange being unbolted.

RELEASE any stored material in piping or system by breaking the vacuum. The breaking of vacuum in piping or systems must be performed at the highest point of the piping or system by opening a valve. After the vacuum is broken, a water flush shall be induced to verify no blockage or potential stored energy in pipe or system.

AWA's corporate representative, Dwayne Maly, testified that contractors are required to comply with the SWI form when breaking flanges. Maly's deposition also contains the following exchange:

[Morales's counsel]: Just as we have specific instruction for the Turner contractors to follow when performing flange breaks which detail even the unbolting of the flanges, is there a similar document that specifically details the operation of a jackhammer to remove scale or—

(Simultaneous speaking.)

[AWA's counsel]: Objection. Object to the form of the question.

[Maly]: Is there a work instruction on how to descale something?

[Morales's counsel]: Yes.

[Maly]: I don't know if we have one exactly written that way. An old JSA [Job Safety Analysis] would tell you how to use the hammer and then where to position yourself

10

is basically what that procedure would be, but I don't know if we actually have one like that or a current one.

[Morales's counsel]: Okay. Would the descaling using the jackhammer, would that work be included in all of the requirements set forth in this document?

[Maly]: In the flange break?

[Morales's counsel]: Yes.

[Maly]: The flange break procedure is basically all that unbolting and then getting the system isolated. If I have scale that's completely blocking the pipe, then you would still be in under that assumption of flange break because flange break is letting you remove piping making sure there's nothing in the system to come out. If the pipe is still scaled up, that flange break still basically applies because you still haven't confirmed that I am into that piping system that nothing is ready to go back to get me.

[Morales's counsel]: Right. So this SWI flange break would apply to the work that was being done while the Turner contractors were jackhammering?

[Maly]: That's correct, yeah.

Maly stated that McCaskill left the facility at some point on September 3, 2014, and that Alvarado then became the AWA "contact" person for the Turner crew from that point.

The day after the accident, AWA's plant manager Ben Kahrs sent an email to AWA employees acknowledging that flush verification of riser 25 was not done correctly:

We had a serious incident yesterday in 35 where the isolation of a mud floor pipe was not done correctly. The Turner supervisor on the job was exposed to an uncontrolled liquor spill from the pipe that was thought to be properly isolated. In this case, the flush verification was not done correctly, even though it was specifically circled on the pre-task brief.

Until further notice, a knowledgeable and Level 2 trained salaried employee will be required for 100% of liquor isolation tasks to visually verify the water flush is done from one side of the fence to the other. This is required before isolation is finalized and the work permit is hung.

11

Arnold Ecle, an AWA operator who worked at the Point Comfort plant, provided an affidavit which stated in part as follows:

4.      As an operator, I was responsible for a Quadrant assigned to me.

5.      Quadrants on the Press Floor are known as ISO, South, North, and Oxalate.

6.      Operators on the Press Floor rotated among the Quadrants.

7.      The Quadrants contain Presses.

8.      The Presses are operated 24 hours per day, 7 days a week, 365 days a year, except for during periods of maintenance.

9.      The Quadrants are staffed by operators like myself 24 hours per day, 7 days a week, 365 days a year.

10.     The responsibilities of an operator of a Quadrant included monitoring the computer system in the Control Room of the Press Floor.

11.     Operators like myself were trained by Alcoa and were responsible for monitoring flow, level, temperature and pressure of the lines feeding the Presses.

12.     When maintenance was performed on the Risers in the Mud Floor (second floor of Press Building) that fed liquor to the Presses, Operators like myself were trained by Alcoa to and were required to enter the number "4" on the computer system in the Control Room of the Press Floor to indicate that the Press was out of service for maintenance on the Riser.

13.     When maintenance was performed on the Risers in the Mud Floor that fed liquor to the Presses, Operators like myself were trained by Alcoa to and were required to monitor the flow and pressure readings on the computer system in the Control Room of the Press Floor to monitor whether the Riser was isolated from the flow of liquor in order to ensure a continuous zero-energy state during the period of maintenance.

14.     Operators like myself were trained by Alcoa that during a period of maintenance, the flow readings on the computer system should be zero.

15.     In the event that that computer system in the Control Room of the Press Floor indicated positive flow during a time in which maintenance was performed on a Riser in the Mud Floor, operators

12

> like myself were trained by Alcoa to immediately report this reading to a supervisor.

Records from the control room indicate that, though the status of riser 25 was shown as "4" for maintenance throughout September 3, 2014, there were positive flow readings during the morning and afternoon up until around 1:00 p.m. It is undisputed that the Turner crew was not advised of these readings.

## C.    Applicability of Chapter 95

By his first issue on appeal, Morales contends that chapter 95 does not apply to his suit because he and his crew were performing routine maintenance rather than "construct[ing], repair[ing], renovat[ing], or modif[ying]" improvements at the plant. *See* TEX. CIV. PRAC. & REM. CODE ANN. §§ 95.002(2), .003.[2]

Morales cites *Montoya v. Nichirin-Flex, U.S.A., Inc.*, 417 S.W.3d 507, 513 (Tex. App.—El Paso 2013, no pet.), wherein a similar argument was made. In *Montoya*, the defendant auto parts distributor hired a company to clean and repair leaks in the corrugated metal roof of its warehouse. *Id.* at 509. An employee for the roofing company suffered fatal injuries when she fell through a corroded part of the roof, and the employee's mother filed a premises liability suit, but the trial court granted summary judgment to the defendant based on chapter 95. *Id.* at 509–10. On appeal, the plaintiff argued that chapter 95 did not apply because the deceased and her employer were not

---

[2] It is undisputed that AWA is the owner of the Point Comfort plant, that press riser 25 is an improvement to AWA's real property, and that Morales's claim arose from the condition or use of riser 25. *See* TEX. CIV. PRAC. & REM. CODE ANN. § 95.002 (West, Westlaw through 2017 1st C.S.); *Ineos USA, L.L.C. v. Elmgren*, 505 S.W.3d 555, 567 (Tex. 2016) (holding that chapter 95 "only applies when the injury results from a condition or use of the same improvement on which the contractor (or its employee) is working when the injury occurs").

13

"constructing, repairing, renovating, or modifying" an improvement to real estate, but rather were performing routine maintenance. *Id.* at 510.

The El Paso court of appeals observed that the terms in chapter 95 must be given their ordinary meaning because they are not specifically defined by statute. *Id.* at 512 (citing *Cities of Austin, Dallas, Fort Worth & Hereford v. Sw. Bell Tel. Co.*, 92 S.W.3d 434, 442 (Tex. 2002) ("Generally, we will accept the words used according to their ordinary meaning, unless given a specific statutory definition . . . .")). The ordinary meanings of the terms used in the statute are as follows:

1.      construct—to build or form by putting together parts; frame; devise.

2.      repair—to restore to a good or sound condition after decay or damage; mend:  to repair a motor; to restore or renew by any process of making good, strengthening, etc.:  to repair one's health by resting.

3.      renovate—to restore to good condition; make new or as if new again; repair.

4.      modify—to change somewhat the form or qualities of; alter partially.

*Id.* (citing WEBSTER'S NEW UNIVERSAL UNABRIDGED DICTIONARY 436, 1236, 1632 (2003)). On the other hand, "maintenance" is ordinarily defined as "care or upkeep, as of machinery or property"; and "maintain" is defined as "to keep in an appropriate condition, operation, or force; keep unimpaired" or "to keep in a specified state." *Id.* (citing WEBSTER'S NEW UNIVERSAL UNABRIDGED DICTIONARY 1160 (2003)). Although the roofing company's proprietor testified that the employee was performing maintenance, not repair, the *Montoya* court held that chapter 95 applied because the employee's "activity was not aimed at keeping the roof in an existing state"; instead, "it was done to restore a primary function of a roof, namely, keeping water and other elements out of the building's interior." *Id.* at 512–13.

14

Morales argues that, unlike in *Montoya*, the work he and his crew were doing at the Point Comfort plant on September 3, 2014 was ordinary, routine maintenance which is not covered by chapter 95. We disagree. Morales's argument hinges on the notion that "maintenance" and the activities specified in chapter 95 are mutually exclusive. But we find no authority to support that general premise. Chapter 95 does not mention "maintenance"—rather, its focus is on four specific activities, and there is nothing in the statute indicating, implicitly or explicitly, that those activities may not be done *as part of* routine maintenance. To the contrary, AWA cites cases, including *Montoya*, where courts have held that activities which seem to fall under the broad definition of "maintenance" nevertheless also constitute "construction, repair, renovation, or modification" under chapter 95. *See Montoya*, 417 S.W.3d at 512; *Francis v. Coastal Oil & Gas Corp.*, 130 S.W.3d 76, 85 (Tex. App.—Houston [1st Dist.] 2003, no pet.) (applying chapter 95 where plaintiff was injured while performing a "coiled-tubing washout" of a well, in which an engine pumps debris out of the well and into a receptacle); *see also Rawson v. Oxea Corp.*, No. 01-15-01005-CV, 2016 WL 7671375, at *12 (Tex. App.—Houston [1st Dist.] Dec. 22, 2016, pet. filed) (mem. op.) (applying chapter 95 where plaintiff was injured while replacing damaged insulators at an electrical substation).[3]

---

[3] AWA also cites several other cases in which courts applied chapter 95, but the issue of whether the plaintiff's activity constituted "construction, repair, renovation, or modification" was undisputed and was not squarely addressed. *See Ineos*, 505 S.W.3d at 559 (plaintiff was injured "while replacing a valve on a furnace header" at a petrochemical plant); *Abutahoun v. Dow Chem. Co.*, 463 S.W.3d 42, 53 (Tex. 2015) (independent contractor was exposed to asbestos while assisting with the installation of pipe insulation); *Oiltanking Houston, L.P. v. Delgado*, 502 S.W.3d 202, 212–18 (Tex. App.—Houston [14th Dist.] 2016, pet. denied) (independent contractor was killed in an explosion while welding a flange on the end of a pipe used to transport crude oil); *Rosa v. Mestena Operating, LLC*, 461 S.W.3d 181, 182–87 (Tex. App.—San Antonio 2014, pet. denied) (plaintiff was injured while "performing maintenance on wooden electrical poles"); *Vanderbeek v. San Jacinto Methodist Hosp.*, 246 S.W.3d 346, 352 (Tex. App.—Houston [14th Dist.] 2008, no pet.) (plaintiff was injured while he was reconnecting a pipe to a sink as part of remodeling a hospital emergency room). Still, these cases illustrate that activities which may arguably be considered "maintenance" are often uncontroversially deemed "construction, repair, renovation, or modification" for

In light of the plain statutory language and the relevant case law, we conclude that the summary judgment evidence adduced here established that the work being done by the Turner crew was of the type covered by chapter 95. By removing solid blinds and replacing them with open blinds, the Turner crew changed the form or qualities of the pipe leading to the riser; and by using the jackhammer to remove scale, they restored the riser to a good, new condition. In other words, they were renovating or modifying the equipment. *See Montoya*, 417 S.W.3d at 512 (defining chapter 95 terms). As in *Montoya*, Turner's activity was not aimed at keeping riser 25 in an existing state; rather, it was done to restore the riser's primary function, namely, enabling the free flow of liquid into and out of the system. *See id.*; *Francis*, 130 S.W.3d at 85 (holding that "the coiled-tubing washout Francis was performing qualified as either repair or renovation of the well" because "the purpose of the coiled-tubing washout was to rehabilitate the well so that the flow of gas could increase"); *see also Rawson*, 2016 WL 7671375, at *9 (holding that plaintiff was "repairing" the substation when he replaced damaged insulators because "the substation could not be fully operational without replacing the damaged insulators"). Thus, chapter 95 applies, regardless of whether the work could be also considered "maintenance."

Morales contends that the risers "were not changed and were not intended to be changed" by Turner's work—they were merely to be opened and cleaned—and that "the only tangible physical change that occurred and that was intended to occur was to the accumulated waste scale inside the pipes, which is not itself an improvement to real property." We disagree. As noted, the swapping of blinds constitutes a modification to the pipe leading to the riser because it changed its form or qualities, allowing caustic to

purposes of chapter 95.

16

flow into the riser.  As for the jackhammering, although that activity may be described in an extremely narrow sense as being directed solely at the scale buildup, the objective of that activity was to modify the riser—which is undisputedly an improvement to AWA's real property—so that caustic could flow into it.

Finally, Morales cites *First State Bank v. Carpenter*, 491 S.W.3d 729, 730 (Tex. 2016), in which the Texas Supreme Court declined to apply chapter 95 where the plaintiff, an independent contractor, was injured while showing roof damage to an insurance adjuster.  The Court held that chapter 95 did not apply because the evidence showed that the property owner "had never fully decided what, if any, repairs to make to the roof" at the time the contractor was injured.  *Id*. at 733.  The present case is distinguishable because there is no dispute that Morales and his crew were under contract and hired to do a specific task at the time Morales was injured.

For the foregoing reasons, we conclude that the trial court did not err in determining that chapter 95 applies to Morales's claims.  We overrule his first issue.

## D.    Fact Issues

By his second issue, Morales argues that, even if chapter 95 applies, there are fact issues as to the section 95.003 factors which preclude summary judgment.  To avoid summary judgment, Morales was required to produce evidence that AWA:  (1) exercised or retained some control over the manner in which the work was performed, other than the right to order the work to start or stop or to inspect progress or receive reports; and (2) had actual knowledge of the danger or condition resulting in Morales's injury and failed to adequately warn.  TEX. CIV. PRAC. & REM. CODE ANN. § 95.003.

### 1. Control

With regard to the first prong of section 95.003, "control" may be proven in one of two ways: (1) by evidence of a contractual agreement that explicitly assigns the property owner a right to control; or (2) by evidence that the property owner actually exercised control over the manner in which the independent contractor performed its work. *Dow Chem. Co. v. Bright*, 89 S.W.3d 602, 606 (Tex. 2002); *Ellwood Tex. Forge Corp. v. Jones*, 214 S.W.3d 693, 700 (Tex. App.—Houston [14th Dist.] 2007, pet. denied). To be liable, the property owner must control or have the right to control the means, methods, or details of the contractor's work such that the contractor is "not entirely free to do the work his own way." *Ellwood Tex. Forge Corp.*, 214 S.W.3d at 700 (citing *Elliott–Williams Co. v. Diaz*, 9 S.W.3d 801, 804 (Tex. 1999)). The right to control the work must extend to the "operative detail" of the contractor's work. *Id.* It is not enough that the owner has the right to order the work to stop and start or to inspect progress or receive reports, nor is it enough to recommend a safe manner for the independent contractor's employees to perform the work. *See Dow Chem. Co.*, 89 S.W.3d at 606–07; *see also* TEX. CIV. PRAC. & REM. CODE ANN. § 95.003(1).

As to actual control, Morales notes that Maly and McCaskill each testified the Turner crew was required to comply with the specific detailed instructions contained in the SWI form when performing a flange break, and McCaskill agreed that the crew "could not do the job in their own way." *See Ellwood*, 214 S.W.3d at 700. Morales further notes that Maly agreed in his deposition testimony that the SWI applicable to flange breaks "would apply to the work that was being done while the Turner contractors were jackhammering." Finally, Morales contends in his reply brief that the flange break SWI

18

establishes AWA's control over the scale pancake removal process because it required Turner to "REMOVE any scale, debris or old gasket material between flanges before make-up of flanges to prevent leaks to system when placing back in service."

We agree with Morales that this constitutes more than a scintilla of probative evidence supporting a finding of actual control "over the manner in which the work is performed." TEX. CIV. PRAC. & REM. CODE ANN. § 95.003(1). Narrowly speaking, the work Turner was hired to do in this case was to swap blinds on two risers. This necessarily entails the unbolting of flanges, and the evidence establishes that AWA required Turner to perform that task according to the detailed instructions contained in the SWI. Moreover, it is undisputed that AWA exercised actual and exclusive control over the verification process, including the proper flushing and draining of the risers, and that the Turner crew relied on AWA's performance of this activity. Accordingly AWA exercised "some control" over the "operative details" of "the work." *See id.*[4]

AWA urges that "the work" at issue here must be limited to the jackhammering of the scale pancake because that is the specific activity which the Turner crew was engaged in at the time Morales was injured. It argues that the SWI therefore does not show actual control under section 95.003 because it does not address the "operative detail" of the scale removal process specifically *See Ellwood Tex. Forge Corp.*, 214 S.W.3d at 700 (citing *Elliott–Williams Co.*, 9 S.W.3d at 804). In a similar vein, AWA contends that the flange break instructions in the SWI cannot constitute "some control" because there is no relationship between those instructions and Morales's injury. It notes

---

[4] In light of this conclusion, we need not address whether there is evidence to support a finding of a contractual right of control. *See* TEX. R. APP. P. 47.1; *Dow Chem. Co. v. Bright*, 89 S.W.3d 602, 606 (Tex. 2002).

that a "nexus must be shown between the [property owner's] retained control and the condition or activity that caused the injury." *Johnston v. Oiltanking Houston, L.P.,* 367 S.W.3d 412, 417 (Tex. App.—Houston [14th Dist.] 2012, no pet.) (citing *Shell Oil Co. v. Khan*, 138 S.W.3d 288, 294 (Tex. 2004); *Elliott–Williams Co.*, 9 S.W.3d at 803; *Hoechst-Celanese Corp. v. Mendez*, 967 S.W.2d 354, 357 (Tex. 1998); *Clayton W. Williams Jr., Inc. v. Olivo*, 952 S.W.2d 523, 528 (Tex. 1997)). In other words, the property owner's duty is "commensurate with the control it retains" over the work. *Id.* (citing *Gen. Elec. Co. v. Moritz*, 257 S.W.3d 211, 214 (Tex. 2008); *Hoechst-Celanese Corp.*, 967 S.W.2d at 357). AWA argues that no "nexus" can be shown here because AWA's control over Turner's work, to the extent that it exists, did not play any part in causing the accident.

We decline to define the "the work" as narrowly as AWA urges. AWA is correct that the evidence does not establish that Morales's injury was caused by, or was even related to, AWA negligently exercising control over Turner's work. But Morales makes no claim to that effect. Instead, Morales's claim is principally based on the independent negligent activity of AWA in failing to ensure that riser 25 was clear of liquor before it directed Turner to begin the flange break. This flush verification process was an integral and inextricable part of Turner's work, and according to Morales, AWA's negligent performance of this activity was a proximate cause of his injury. We conclude that AWA's exclusive control over this process constitutes "some control over the manner in which the work is performed" under section 95.003(1). Any other construction of section 95.003 would lead to an absurd result, as a property owner would have blanket immunity from liability for its own direct negligence in causing injury to a contractor, in all cases except where the contractor specifically alleges that the property owner negligently exercised

20

control over the contractor's work. *See Ineos USA, LLC v. Elmgren*, 505 S.W.3d 555, 563 (Tex. 2016) (noting that, in construing chapter 95, we rely "on the plain meaning of the text unless a different meaning is supplied by statutory definition, is apparent from the context, or the plain meaning would lead to an absurd or nonsensical result").

We conclude that the record evidence, viewed in the light most favorable to Morales, *see City of Keller*, 168 S.W.3d at 824, establishes an issue of material fact concerning whether AWA exercised or retained "some control" over the manner in which the work was performed. *See* TEX. CIV. PRAC. & REM. CODE ANN. § 95.003(1).

### 2. Actual Knowledge

We must next determine whether the evidence created a fact issue as to the second prong of section 95.003—i.e., that AWA had actual knowledge of the danger or condition that resulted in Morales's injury but failed to adequately warn. *See id.* "Actual knowledge requires knowledge that the dangerous condition existed at the time of the accident, as opposed to constructive knowledge which can be established by facts or inferences that a dangerous condition could develop over time." *City of Corsicana v. Stewart*, 249 S.W.3d 412, 414–15 (Tex. 2008). Circumstantial evidence may establish actual knowledge, but only when it "either directly or by reasonable inference" supports that conclusion. *Id.* at 415.

The summary judgment evidence here included Ecle's affidavit which stated that operators were trained to monitor liquor flow from the plant's control room and to ensure that the flow readings were zero during periods of maintenance. Ecle further stated control rooms in each quadrant of the plant are "staffed by operators like myself 24 hours per day, 7 days a week, 365 days a year." However, there were positive flow readings

21

for riser 25 during the morning and early afternoon of September 3, 2014, indicating the presence of liquor in the riser. This was the dangerous condition that injured Morales, but it is undisputed that he was not warned of the condition.

Additionally, McCaskill testified that he did not ensure that the line was flushed with water prior to the Turner crew starting their work. Although McCaskill stated that he did not believe this was required by AWA procedures, plant manager Kahrs stated in his email to AWA employees that "the flush verification was not done correctly."[5] In any event, regardless of whether a water flush was specifically required by AWA procedures, McCaskill's testimony is more than a scintilla of evidence that AWA was aware that riser 25 had not been flushed and therefore could not be verified as isolated.

Again viewing the evidence in the light most favorable to Morales, *see City of Keller*, 168 S.W.3d at 824, we conclude that a trier of fact could reasonably infer that Alcoa had actual knowledge of the presence of liquor in riser 25 at the time of the accident. *See City of Corsicana*, 249 S.W.3d at 414–15; *Abarca v. Scott Morgan Residential, Inc.*, 305 S.W.3d 110, 125 (Tex. App.—Houston [1st Dist.] 2009, pet. denied) (finding an issue of material fact as to actual knowledge of dangerous construction of scaffolding where evidence established that defendant's employees "were present while the scaffold was built and gave instructions regarding its construction"), *disapproved of on other grounds by Ineos USA*, 505 S.W.3d at 564 n.3. Accordingly, there is a fact issue precluding summary judgment. Morales's second issue is sustained.

---

[5] As noted, the flange break SWI form indicated that "verification"—defined as the "witnessing of water being flushed through piping, vessels, tanks, pump or valves before the unbolting of flanges"—"must be performed before starting task," and if verification cannot be done, "a Flange Break Permit must be completed and authorized by the Department Superintendent or his/her designee prior to beginning work." It is undisputed that no Flange Break Permit was obtained here.

**F.     Claims Against Alvarado**

By his third issue, Morales argues that the trial court erred in granting summary judgment to Alvarado.  Alvarado argued in his motion that there is no evidence he owed an individual duty to Morales or that he breached any such duty.

"Though the existence of duty is a question of law when all of the essential facts are undisputed, when the evidence does not conclusively establish the pertinent facts or the reasonable inferences to be drawn therefrom, the question becomes one of fact for the jury."  *Helbing v. Hunt*, 402 S.W.3d 699, 703 (Tex. App.—Houston [1st Dist.] 2012, pet. denied); *see Mitchell v. Mo.-Kan.-Tex. R.R. Co.*, 786 S.W.2d 659, 662 (Tex. 1990) ("While foreseeability as an element of duty may frequently be determined as a matter of law, in some instances it involves the resolution of disputed facts or inferences which are inappropriate for legal resolution."), *overruled on other grounds by Union Pac. R.R. Co. v. Williams*, 85 S.W.3d 162 (Tex. 2002).  Thus, in a summary-judgment proceeding, if the nonmovant's version of the facts would support the imposition of a legal duty, summary judgment for the defendant based on a claim of no duty is inappropriate.

Generally, a corporation is vicariously liable for the tortious acts of its employee when those acts are within the course and scope of employment.[6]  *See, e.g., Goodyear Tire & Rubber Co. v. Mayes*, 236 S.W.3d 754, 757 (Tex. 2007).  An employee may, however, be individually liable for his or her own negligence when he or she "owes an independent duty of reasonable care to the injured party apart from the employer's duty."  *Leitch v. Hornsby*, 935 S.W.2d 114, 117 (Tex. 1996); *see Tri v. J.T.T.*, 162 S.W.3d 552,

---

[6] It is undisputed that Alvarado was acting within the course and scope of his employment with AWA at all times relevant to Morales's claims.

23

562 (Tex. 2005). In other words, "liability cannot be imposed on employees where the employer and the employees committed the identical negligent acts or omissions." *In re Butt*, 495 S.W.3d 455, 466–67 (Tex. App.—Corpus Christi 2016, orig. proceeding) (citing *Tri*, 162 S.W.3d at 562; *Leitch*, 935 S.W.2d at 117; *Pico v. Capriccio Italian Rest., Inc.*, 209 S.W.3d 902, 904 (Tex. App.—Houston [14th Dist.] 2006, no pet.)). But "a corporate agent is personally liable for his own fraudulent or tortious acts." *Id.* (citing *Miller v. Keyser*, 90 S.W.3d 712, 717 (Tex. 2002); *see Leyendecker & Assocs., Inc. v. Wechter*, 683 S.W.2d 369, 375 (Tex. 1984); *Khan v. GBAK Props., Inc.*, 371 S.W.3d 347, 359 (Tex. App.—Houston [1st Dist.] 2012, no pet.)).

In *In re Butt*, we held that corporate officials for H.E.B. Grocery Company did not owe an independent duty of care to a plaintiff who slipped and fell at an H.E.B. store. 495 S.W.3d at 466–67. The plaintiff, in paragraph 27 of his petition, alleged that H.E.B. owed a duty to its invitees to reasonably inspect the store to discover dangerous conditions, and that H.E.B. breached that duty "by choosing not to use computerized video surveillance, or a comparably effective and financially feasible alternative means, to inspect the store to identify timely and reliably the presence of foreign materials on the floor of the store." *Id.* at 458. As to the individual corporate officers, the plaintiff alleged only that they "had control over what was and was not done by H.E.B., to discharge H.E.B.'s duty to its patrons, as described in paragraph 27" and that they "failed to exercise such control with reasonable care." *Id.* We concluded that, because the allegations against the officers were "identical" to the allegations against the corporation, the plaintiff did not establish that the officers owed an individual duty "either by virtue of their positions as apex corporate officials or as a result of their own actions." *Id.* at 467. We noted that

24

the plaintiff did not allege that the officers "committed tortious or fraudulent acts, or that they personally created the allegedly dangerous condition at issue in this case—a wet floor." *Id.* at 466.

This case is distinguishable from *In re Butt* because Morales does not seek to hold Alvarado liable by virtue of Alvarado's status as a corporate officer. Instead, he claims that Alvarado was personally responsible for the failure to verify that riser 25 was clear of process liquor at the time Turner was directed to start their work. Morales cites federal district court cases holding that, under Texas law, an employee may be liable when he or she is personally involved in directing or participating in tortious acts as part of his or her employment. *See Richardson v. Wal-Mart Stores Tex., LLC*, 192 F. Supp. 3d 719, 723 (S.D. Tex. 2016) (holding that a Wal-Mart employee was liable for actions taken during the course and scope of her employment because "[u]nlike the defendant in *Leitch*, [the employee] was personally involved in the conduct that allegedly contributed to [the plaintiff's] injury"); *Lyle v. 24 Hour Fitness, USA, Inc.*, No. A-14-CA-300 LY, 2014 WL 5094126, at *4 (W.D. Tex. Oct. 10, 2014) (noting that Texas law creates an independent duty for store managers in premises liability cases when "the pleadings alleged the store manager or agent played a personal role in creating the dangerous condition at issue"); *Alexander v. Lincare Inc.*, No. CIV A 3:07-CV-1137-D, 2007 WL 4178592, at *3 (N.D. Tex. Nov. 27, 2007) (noting that "[a] corporation's employee is personally liable for tortious acts which he directs or participates in during his employment" and collecting cases).

Morales's response to Alvarado's summary judgment motion cites the following evidence as support for his claim that Alvarado was personally involved in directing or participating in tortious acts: (1) Maly's deposition testimony stating that after McCaskill

25

left the Point Comfort plant in the middle of the day on September 3, 2014, Alvarado became AWA's "contact" person for the Turner crew; (2) McCaskill's testimony that the pipeline leading to riser 25 was not flushed with water; (3) the flange break SWI, which states that "FLUSHING of water must be performed from isolation to isolation for true verification not just across the flange being unbolted"; and (4) Kahrs' email, which acknowledged that "flush verification was not done correctly, even though it was specifically circled on the pre-task brief." We find that this evidence, when viewed in the light most favorable to Morales, *see City of Keller*, 168 S.W.3d at 824, creates a fact issue as to whether Alvarado owed and breached an individual duty to Morales. Morales's third issue is sustained.

## III. CONCLUSION

Because chapter 95 applies to Morales's claims, we affirm the trial court's denial of his motion for partial summary judgment. However, having found disputed issues of material fact as to those claims, we reverse the trial court's summary judgment in favor of AWA and Alvarado. The cause is remanded for further proceedings consistent with this opinion.

DORI CONTRERAS
Justice

Delivered and filed the
17th day of May, 2018.